OPINION OF THE COURT
Judith D. Waksberg, J.
On December 5, 2013, the petitioner B.T. filed a petition for a finding that her husband, respondent D.M., had violated an order of protection. That order of protection was entered on consent for two years on June 7, 2012. The violation petition alleged that D.M. had violated the order of protection by having his son C.F. repeatedly call Ms. T., and having Mr. F. show *182 up at Ms. T.’s home and knock and kick at her door while becoming verbally abusive to her. On June 3, 2014, Ms. T.’s counsel filed an order to show cause why the final order, of protection granted to Ms. T. in 2012 should not be extended for another period of two years for good cause. Ms. T.’s affidavit, which was annexed to the order to show cause, alleged that Mr. M. had repeatedly telephoned Ms. T. and that she had seen him around her home. She also referred to the incidents involving C.F. which were alleged in her violation petition.
Also in June 2014, Mr. M. filed a petition for visitation with his child. An order dated June 7, 2012, issued on consent, granted Ms. T. custody of the child that she and Mr. M. have in common. Mr. M.’s June 30, 2014, petition noted that the order of protection granted in 2012 which required him to stay away from Ms. T. and the child was to expire on June 6, 2014. (Mr. M. had previously filed for visitation in 2013, but that petition was withdrawn.) At the time of the filing of Mr. M.’s visitation petition in 2014, his son was 12 years old. Forensics were ordered and hearings were held on Ms. T.’s violation petition and her motion to extend the order of protection and on Mr. M.’s visitation petition.
The Attorney for the Child did not present any evidence at the hearings; however, she supported the mother’s request that the order of protection be extended on behalf of the child and she also opposed the father’s request for an order of visitation with the child.
For the reasons stated below, Ms. T.’s petition for a violation of the order of protection is denied and the petition is dismissed. However, her application for an extension of the final order of protection that was entered in 2012 is granted.[1] Mr. M.’s request for visitation is denied as he did not prove that such visitation would be in the best interests of the child.
Evidence[2]
B.T.’s Testimony
Ms. T. testified that she and Mr. M. began living together in 2001. She gave birth to the child in 2002 and she and Mr. M. were married in 2004. They were still married at the time of *183 the hearing. Ms. T. has another child, a daughter, who was 23 years old at the time of her testimony.
Ms. T. testified that she and Mr. M. separated in 2007 because of his abuse of her. She said that he would scream and yell at her and hit her. He would call her “stupid” and a “bitch.” She said the verbal abuse started after she gave birth to their son and it continued every day. While they were living together, she said that Mr. M. would hit her “every other day,” that he would push her until she fell on the floor, and that he would put her out of the car and make her walk home. She said that their son was present when the father acted this way and that the child would “scream and cry” while observing the domestic violence.
After the parents separated in 2007, Ms. T. stated that Mr. M. would show up unannounced at her home about three times a week, screaming, yelling, and banging on her door. She said the child would cry in response to this behavior. Ms. T. described an incident on Easter in 2011 when Mr. M. hit her in her face with a closed fist. This incident occurred on the street and the child was present. She said that the child started screaming and crying when his mother was hit. Ms. T. called the police after she was hit and Mr. M. was arrested. Ms. T. testified that after his arrest, Mr. M. kept calling her and threatening her not to pursue the charges because he would lose his job and that if she did not drop the charges, he would hurt her. She said that Mr. M. physically brought her to the District Attorney’s office and waited outside in his car while she went in and told the District Attorney that she wanted to drop the charges.
In early 2012, when the child was nine years old, Ms. T. recounted that she and Mr. M. got into an argument outside the child’s school cafeteria and Mr. M. started grabbing the child to take him away from Ms. T. The child was scared, and began screaming. Ms. T. took the child back to her apartment. Mr. M. then came to her apartment and when she opened the door, he grabbed her by the neck and started choking her. She said that she could not breathe, and that Mr. M. continued to hit her. She said that the child was there and was watching as his father choked and hit his mother. Eventually, Mr. M. let go of her and left. She said that the child was hiding in the apartment and he was shaking and crying. Ms. T. stated that she observed a change in the child’s behavior after this incident: he seemed scared and frightened and he would cry and exhibit a *184 sad face. In 2012, Ms. T. filed a petition for an order of protection.
Ms. T. testified that after the final order of protection was granted, she would nevertheless observe Mr. M. parked in his car outside her home. She said that in 2014, she saw him watching her home from his car once a week or every other day. She said that once, when she and the child were coming home from school, they both saw Mr. M. parked in his car and she and the child started running home. On cross-examination, Ms. T. said that the last time she saw Mr. M. driving around where she lives was about two months before her testimony.
Ms. T. also testified that Mr. M. would call her from a blocked number. She said that she knew it was Mr. M. because she recognized his voice. He would call her a “bitch” and say that he was going to pick up the child. Ms. T. would respond that she had an order of protection and told him to leave her alone. She said that in 2013, Mr. M. was calling her twice a week.
In October 2013, Mr. M.’s adult child, C.F., came to Ms. T.’s home. Ms. T. said that he was knocking and banging on the door, asking to see the child. She said that prior to 2013, Mr. F. had not come to her house or contacted her.
Ms. T. testified that she had never spoken to the child about how she feels about Mr. M. When Ms. T. told the child that his father would be calling him for his birthday in 2016, she said that the child began to cry in response. When Mr. M. called to say happy birthday, the child said that he did “not want to be bothered.”
Ms. T. also testified about an incident that occurred during a court-ordered visit which was to be supervised by a social worker in 2016. Ms. T. testified that she told the child before the visit that it was important to build a relationship with his father. Ms. T. said that she dropped the child off and walked to the park to wait for him. Shortly thereafter, the child came running towards her in the park, followed by the social worker. D.M.’s Testimony
Mr. M. testified that he and Ms. T. were married in April 2004. In 2009, Ms. T. would accuse him of being with another woman, but it was not true. However, he said that Ms. T. was seeing someone else. Mr. M. said that when he and the mother lived together, he had a “great” relationship with the child. He would take the child to the park and take him out to eat. He would discipline the child by raising his voice and he did not hit the child.
*185 Mr. M. said that he and Ms. T. had a good relationship while they were together. He said that he did not get upset with her, he did not hit her and did not strangle her. He did not raise his voice to her in the presence of the child.
At the time that he and Ms. T. went to court on her original petition for an order of protection, Mr. M. testified that he agreed to the order of protection because he “wanted nothing to do” with Ms. T. He said that he complied with the order of protection and never contacted Ms. T. after it was issued. He stated that his only concern was to see his son.
Mr. M. testified that he is a “scofflaw agent,” putting boots on cars. He said that every day he is in a different precinct. At the time of his testimony, he was working from 8:00 a.m. to 5:00 p.m., but when he first started working in October 2012, his hours were 4:00 p.m. to 12:00 a.m. Mr. M. admitted that he was convicted of a misdemeanor assault in 2014 for which he was sentenced to a year’s probation. He did not recall being convicted of robbery and claimed he could not remember what he was convicted of, but admitted that he was convicted of a crime in 1998 and that he served eight years for that crime.
Mr. M. testified that he was living with his fiancée who has three daughters and stated that he has a good relationship with the girls. He said that if the child were to stay at his home, he would have his own bed and television there.
Mr. M. said that he has two sons: C.F. who was 28 years old and the subject child who was 14 years old at the time of his testimony. Mr. M. recounted that in 2009, C.F. and the child would play video games together and when C.F. would come to the house, Mr. M. and C.F. and the child would go to the basketball court or to the park together.
Mr. M. testified that he has no relationship now with the child. The last time he saw the child was in 2016 on a court-ordered supervised visit. The child came into the room, the supervisor began asking him questions, and the child got up and said he was “out of here.” Mr. M. had another supervised visit in December 2014 that lasted between 20 minutes to half an hour. Before that, the last time Mr. M. saw the child was in 2012. Mr. M. went to Ms. T.’s apartment to take the child out to a movie. He had told the mother he was coming to pick the child up and when he got there, she opened the door. Mr. M. left with the child but Ms. T. then followed them and said she was going to go with them. Mr. M. told her that she would have to pay for herself. The child wanted to see the Ninja *186 Turtles movie. Afterwards, they stopped at the Burger King and then went back to Ms. T.’s apartment. Mr. M. said that Ms. T. then followed him to the bus stop, and, as he was waiting for the bus, was pulling on his jacket. Mr. M. raised his hands above his head and walked away from her as she said, “you’re not going anywhere, you’re my husband.” Mr. M. denied hitting her or the child.
Mr. M. said two days later he received a telephone call from a detective. He went to the precinct and told the police he did not hit anyone. He insisted that Ms. T. come down to the precinct to show if she had a mark on her. He said that when Ms. T. walked in, the police were “dumbfounded” because she did not have any marks on her. However, Mr. M. admitted that he was arrested and taken “downtown” and that a judge issued an order of protection against him. Eventually, the case was dismissed. Mr. M. denied bringing Ms. T. to the District Attorney’s office in order to have her drop the charges against him.
Mr. M. testified that he did not believe that the child should be forced to visit with him. At the supervised visit that Mr. M. had with the child when the child was 12 years old, the child did say he did not wish to see his father, but Mr. M. believed that the child was saying that because of things Ms. T. had said to him. Mr. M. stated that the child should be allowed to make up his own mind about the visits.
Testimony and Report of Forensic Evaluator
Dr. Mark Rand, a psychologist who has testified many times in various courts in New York State, as well as federal court, was qualified as an expert over the objection of the father. His CV was entered into evidence as court’s exhibit 1 and his report was entered into evidence as court exhibit 2.
Dr. Rand testified that he could “not say that he saw anger” in Ms. T. toward Mr. M., but that she expressed fear of Mr. M. on behalf of herself and the child.
Dr. Rand said that his interview with the child was neither a routine nor an easy one: the child was anxious, withdrawn, frightened, and tearful. The child told the doctor that Mr. M. had hit him and showed him a scar on his arm that he said the father had caused. He told the doctor that he had seen his father try to choke his mother and saw him hit his mother. The child was “not interested” in talking about his father. Dr. Rand asked the child if his mother said bad things about his father, *187 and the child replied, “yes, that she hate[s] him.” Dr. Rand’s interpretation was that the child was exposed to negative information about the father by the mother, but he did not think that the mother was actively trying to alienate the child from his father. Dr. Rand’s opinion was that the child’s resistance to seeing his father had to do with the abuse the child had witnessed and the father’s multiple absences from the child’s life. The child’s refusal even to engage in a discussion about his father “looked like trauma” to Dr. Rand. Dr. Rand stated that he would be concerned about introducing visits between the child and his father at a time when the child is so opposed to them. Forcing him to see his father could worsen the situation. He noted that the child is in special education and that he is a child with high anxiety and fearfulness and that he is low in resilience.
Dr. Rand also made reference to the incident which occurred during a supervised court-ordered visit. The visit was to be supervised by a social worker, Diane Hesseman. Ms. T. brought the child to the visit and was asked to wait in the park across the street until the visit was over. A few minutes after the visit commenced, the child left the premises and ran across the street to the park to his mother. Asked what would happen if the court ordered visits between the child and his father, Dr. Rand opined that the child would become excessively anxious and it would disrupt his daily functioning.
Dr. Rand stated that he could imagine a scenario of rehabilitation of the father as a parent, but only if the father obtained counseling.
Findings of Fact and Conclusions of Law
The court found the testimony of Ms. T. to be credible. She appeared genuinely frightened of Mr. M. and described the domestic violence she suffered in a forthright, detailed, and believable manner. Her description of the abuse she suffered was consistent in her testimony and in the version that she recounted to the forensic evaluator. Moreover, the child’s rejection of his father was, as found by the forensic evaluator, consistent with a child who has witnessed serious domestic violence committed by his father against his mother.
In contrast, Mr. M.’s testimony that he never abused Ms. T. was not credible. There was no plausible reason proffered for Ms. T. to invent her description of being punched in the face during one incident and choked during another. Mr. M.’s assertion that he never choked Ms. T. and that the police were *188 “dumbfounded” when they saw Ms. T. because she had no marks on her after this incident was contradicted by his own testimony that he was arrested and arraigned before a criminal court judge who issued a temporary order of protection. Although the charges were ultimately dropped against him, Ms. T. testified credibly that she herself had asked the District Attorney to drop the charges because Mr. M. had threatened to hurt her if she did not.
Ms. T. also testified credibly that Mr. M. continued to stalk her and to harass her with threatening phone calls after the entry of the initial order of protection. Indeed, Mr. M.’s employment as a scofflaw agent means that he is driving around in his car during the day, giving him the opportunity to park his car often near Ms. T.’s home, as she described. Mr. M.’s blanket denial of stalking Ms. T. or calling her on the phone was also not credible.
The court also accepts the conclusions of the forensic evaluator and finds them to be solidly based upon his assessments of the parents and the child. The evaluator’s conclusion that the child’s reluctance to see his father is based on the child’s history of witnessing domestic violence inflicted by the father on the mother and the father’s long absence from the child’s life is consistent with the credible testimony at the hearing. The fact that the child was unable to endure even a few minutes of a supervised visit with his father also speaks volumes to the impairment of the father-son relationship caused by the domestic violence witnessed by the child.
Ms. T.’s violation petition is dismissed. That petition alleges that Mr. M. violated the order of protection by sending his older son, C.F., to Ms. T.’s home. Ms. T.’s testimony about the incident when C.F. came to her door established only that Mr. F., the child’s half brother, came to Ms. T.’s apartment and banged on the door and yelled that he wanted to see the child. This evidence was insufficient to prove that Mr. M. sent Mr. F. to Ms. T.’s home in order to harass her and the child. As this was the only violation alleged in the petition alleging a violation of the order of protection, that petition is dismissed.
However, Ms. T.’s application to extend the order of protection for good cause is granted. The credible evidence established that due to the serious physical violence Ms. T. suffered at the hands of Mr. M., and the violence that the child witnessed, it was reasonable for Ms. T. and the child to be frightened of Mr. M. The evidence also established that even *189 after the original order of protection had been in effect, Mr. M. continued to harass and menace Ms. T. and the child by sitting in his parked car near their home and by making threatening phone calls.
These behaviors constitute good cause to extend the order of protection for an additional two years. (Family Ct Act § 842 [a court “may . . . , upon motion, extend (an) order of protection for a reasonable period of time upon a showing of good cause”].) In Matter of Molloy v Molloy (137 AD3d 47, 53 [2d Dept 2016]), the Second Department listed the factors to be taken into consideration in determining good cause to extend an order of protection:
“the nature of the relationship between the parties, taking into account their former relationship, the circumstances leading up to the entry of the initial order of protection, and the state of the relationship at the time of the request for an extension; the frequency of interaction between the parties; any subsequent instances of domestic violence or violations of the existing order of protection; and whether the current circumstances are such that concern for the safety and well-being of the petitioner is reasonable . . . .”
In the instant case, the circumstances leading up to the entry of the initial order of protection involved severe instances of physical violence against the mother which were witnessed by the child. At the time of the request for the extension, the mother and child were both still frightened by the father and the father fed that fright by continuing to violate the order of protection by stalking the mother and the child and by continuing to call the mother on the phone. The mother’s ongoing concern for her own safety and that of her child is reasonable under these circumstances and the court therefore finds that an extension of the order of protection is warranted.
The father’s petition for visitation with his son is denied. “In adjudicating visitation, the most important factor is the best interests of the children . . . .” (Matter of Shockome v Shockome, 53 AD3d 618, 619 [2d Dept 2008].) The father has not proved that ordering visits between the father and the child is in the child’s best interests. As the forensic evaluator recounted, the child is a child with high anxiety and fearfulness and one who is low in resilience. Dr. Rand opined that forcing the child to visit with his father at this point could have a negative impact on the child’s daily functioning. Indeed, *190 the child was unable to tolerate even a short supervised visit with his father, running out of the visit and across the street to join his mother.
In his testimony, Mr. M. stated that he did not believe that his child should be forced to visit with him against his will. Mr. M. believed, however, that the child’s reluctance to visit with him sprang from alienating actions by Ms. T. The evidence did not bear this out. Dr. Rand stated that he saw no signs of alienating behavior by Ms. T. Neither did the court observe Ms. T. in her testimony to be invested in alienating her son from his father. Rather, Ms. T. showed herself to be genuinely frightened of Mr. M. and concerned about her own safety and that of her child. The court agrees with Dr. Rand’s assessment that the child’s resistance to visiting with his father stems from the father’s own behavior—his physical abuse of the child’s mother and his absence from the child’s life. In this anxious and fearful child, an order requiring visits with his father would surely not be in his best interests. (See Matter of Anise C. [Angelica C.], 145 AD3d 882, 883 [2d Dept 2016] [“Family Court’s finding that there was substantial evidence that visitation would be detrimental or harmful to the children’s welfare and contrary to their best interests, has a sound and substantial basis in the record”].) The father’s petition for visitation with his son is therefore denied.

. Temporary orders of protection were granted during the pendency of the case.

. Although the hearings on the order of protection and on the violation petition were held separately, the evidence is summarized together in this decision.